IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN ROBERT DAY, | ) | Case No. 1:16-cv-2813 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | **REPORT & RECOMMENDATION** |
| | ) | |

## I.    Introduction

Plaintiff, John Day, seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act.  This matter is before the court pursuant to 42 U.S.C. §1383(c)(3), 42 U.S.C. §405(g) and Local Rule 72.2(b).

Although the ALJ properly evaluated the medical opinion evidence and supported her conclusions concerning Day's functional limitations with substantial evidence, she erred in the framing of her hypothetical question to the vocational expert witness.  Because this error was not harmless, I find the ALJ's conclusion that there were jobs Day could perform despite his limitations not to be supported by substantial evidence.  I recommend that the final decision of the Commissioner be VACATED and the case be REMANDED for limited further proceedings consistent with this Report & Recommendation.

## II.    Procedural History

Day protectively filed an application for DIB on July 31, 2009.  (Tr. 127)  Day alleged

his disability began on March 7, 2009.  (Tr. 127-130)  Day's applications were denied initially

on February 4, 2010 (Tr. 65-68) and upon reconsideration on July 9, 2010. (Tr. 72-74)  Day

requested a hearing on September 1, 2010.  (Tr. 79)  ALJ Ben Barnett heard the case on August

16, 2011.  (Tr. 33-62)  On October 3, 2011, the ALJ denied Day's claims for benefits.  (Tr. 7-25)

The Appeals Council denied review of the ALJ's decision on February 1, 2013.  (Tr. 1-3)

Day appealed to this court.  On April 16, 2014, the District Court remanded the case for

further proceedings. (Tr. 884)  A new hearing was held on July 27, 2015 before ALJ Yelanda

Collins. (Tr. 909-945).  The ALJ issued a decision on October 23, 2015. (Tr. 884-894)  On

September 24, 2015, the Appeals Council denied review.  Day appealed to this court on

November 18, 2016. ECF Doc. 1

## III.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Day was born on May 20, 1962 and was 53 years old when the 2015 hearing took place.

Day has a law degree and was admitted to the Ohio Bar on November 6, 1989. (Tr. 918)  Day

has past work experience as a teacher, a lawyer, and as a salesperson for Circuit City. (Tr. 40-43)

### B.    Medical Evidence

Day's impairments are mostly psychological in nature.  Day began treating with

psychiatrist, Dr. Michael Tran, in 2009.  Dr. Tran initially diagnosed depression but later added

the diagnoses of Bipolar Disorder. (Tr. 853)  Dr. Tran's treatment notes also have a "problem

list" which includes obsessive compulsive disorders as one of Day's problems.  (Tr. 477-478)  In

May 2010, Dr. Tran noted that Day's mood was good; he was happy that the medications were working well. (Tr. 588)

Day also treated with psychiatrist, Dr. Jyoti Aneja. Her records showed some improvement of Day's bipolar disorder. In June 2011 she noted that he was enjoying working but was concerned about gaining 40 pounds over the prior year. At that time, Day "denied having any anxiety or anger related issues." (Tr. 823) Day reported that counseling had "really helped him a lot." (Id.) On mental status examination, Dr. Aneja noted that plaintiff's mood was anxious but his attention and concentration were sustained, his recent and remote memory were within normal limits, and his thought process was logical and organized. (Id.)

While treating with Dr. Aneja, Day received counseling from Therapist Kristen Liviskie. (Tr. 657) Following her first visit with him, Ms. Liviskie noted improvement of Day's bipolar disorder with medication. She also gave him feedback "that he most likely [didn't] have anger issues, but rather needs to work on different ways to approach situation with his mother as *she is the only one that he argues with*." (Id. Emphasis added.) Day requested to meet with Liviskie on a weekly basis to manage stress. (Tr. 657-658) Ms. Liviskie was treating Day when he began working as a secret shopper. Her records note that he was having difficulty staying organized; setting boundaries; and taking on more tasks that he could complete. (Tr. 630)

On April 4, 2012, Dr. Thomas Swales, a psychiatrist and Director of the Psychological Assessment Center, conducted a neuropsychological evaluation of Day. (Tr. 1404) Dr. Toni Johnson of the Psychological Assessment Center administered several tests but found that the results were invalid. (Tr. 1404-1407) Based upon Day's inconsistent effort and cooperation, Dr. Johnson felt that there was an indication of possible malingering. However, she qualified this opinion by stating that she "would not want to call him a malingerer, or interfere with his

medical and psychiatric medications . . . . The existence of malingering does not exclude the possibility that bona fide symptoms might exist currently, as they have in the past." (Tr. 1407) Dr. Johnson recommended outpatient psychiatric and medical follow up. Dr. Swales endorsed Dr. Johnson's opinion. (Tr. 1407)

The record contains a couple of progress notes from Leanne Hardy, a professional clinical counselor noting that Day had attended two sessions and made no progress toward his treatment plan goal. (Tr. 1804) She later noted that he was transferred to Rebecca Fuller, an advanced practical nurse. Day was working on self-esteem issues and self-acceptance; he struggled with certain family relationships. (Tr. 1872)

### C. Opinion Evidence

#### 1. Treating Psychiatrist – Dr. Michael Tran – April 2010

Dr. Tran completed an assessment of Day's ability to do work-related activities on April 6, 2010. (Tr. 851-854) Dr. Tran opined that Day had a moderate impairment in key areas such as attention and concentration as well as the ability to complete a normal day in a workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Dr. Tran also opined that Day had a moderate impairment in accepting supervision and getting along with coworkers. (Tr. 852) Dr. Tran's assessment included a hand-written note stating that Day was unable to work due to his bipolar illness and that "[h]e would benefit from social security disability." (Tr. 854)

#### 2. Treating Psychiatrist – Dr. Jyoti Aneja – June 2011

In June 2011, Dr. Aneja completed a medical assessment of Day's ability to sustain work-related activities due to his mental impairments. (Tr. 804-805) Dr. Aneja opined that Day could function satisfactorily 60-80% of the time in making occupational adjustments. (Tr. 804-

805)  She noted that Day had a long standing history of bipolar disorder that had not been treated until a few years ago.  (Tr. 805)  She estimated his GAF scores ranged from 60 to 65.  (Tr. 807)

### 3.    Therapist Kristen Liviskie – July 2011

On July 6, 2011, Ms. Liviskie completed a medical assessment of Day's ability to sustain work-related activities due to his mental impairments. (Tr. 808-811)  Ms. Liviskie opined that Day would be able to function satisfactorily in the workplace less than 40% of the time.  She stated that Mr. Day's bipolar symptoms would interfere with his ability to maintain a job and that his irritability and impulsivity caused difficulties with interacting with co-workers and customers. (Tr. 809)

### 4.    APRN – Rebecca Snider Fuller – August 14, 2015

On August 14, 2015, APRN Rebecca Snider Fuller completed a questionnaire regarding Day's ability to do work-related activities. (Tr. 1874-1876)  Ms. Snider Fuller had been treating Day since August 2013. (Tr. 1084)  Dr. Ewauld Horvath also signed the questionnaire completed by Ms. Snider Fuller. (Tr. 1876)  Ms. Snider Fuller felt that Day's abilities to work were poor in several areas including maintaining regular attendance and being punctual within customary and usual strict tolerances; completing a normal workday and workweek without interruptions from psychologically based symptoms; accepting instructions and responding appropriately to criticisms from supervisors; maintaining socially appropriate behavior; and maintaining attention for two hour segments. (Tr. 1874-1876)  This questionnaire also stated that Day would likely miss work twice a month due to his impairments or treatment. (Tr. 1876)

### 5.    State Agency Consultant – Psychologist David House, Ph.D. – December 2009

Psychologist David V. House performed a consultative psychological evaluation on December 15, 2009. (Tr. 283)  Dr. House diagnosed PTSD and assigned a GAF score of 61. (Tr.

288) He concluded that Day's abilities were only mildly impaired in terms of attention, concentration, persistence and pace; ability to withstand stress and pressures associated with day-to-day work activities; and the abilities to relate to fellow workers and supervisors. (Tr. 287-288)

### D. Testimonial Evidence

At the July 27, 2015 ALJ hearing, Day testified as follows: (Tr. 909-945)

- He is five feet eight inches. (Tr.916)

- At the time of the hearing he weighed approximately 258 pounds. (Tr. 916)

- He was living alone in an apartment; his mother paid all his bills. (Tr. 917)

- Day had a driver's license and drove to the grocery store and occasionally the movies. (Tr. 917-918)

- Day obtained a law degree in 1987 and became licensed in 1989. (Tr. 918) However he did not practice much as an attorney. His license was inactive. (Tr. 919-920)

- Day also taught classes for paralegals and worked at Circuit City. (Tr. 920-921)

- Day was fired from one job because he almost missed a deadline for filing a pretrial statement. (Tr. 921) He was fired from a teaching position because he said something inappropriate to a student. (Tr. 922)

- Day believed he was unable to work because he had difficulty working with people, being on-time, meeting deadlines, and complying with work-place rules. (Tr. 922)

- Since he stopped working, Day would typically go to bed around 4:00 a.m. and sleep until noon or 1:00 p.m. in the afternoon. He would then drink coffee and watch TV. (Tr. 924)

- Day's weight had fluctuated throughout his adult life. He felt that he might have some physical limitations with standing more than two hours. He estimated that he could walk for 25-30 minutes. (Tr. 925-927)

Medical Expert ("ME") Larry Caesar also testified during the hearing. (Tr. 935-939)

- Dr. Caesar reviewed Day's records and found that they substantiated a diagnosis of mood disorder, not otherwise specified, and anxiety disorder, not otherwise specified. (Tr. 935)

- Dr. Caesar opined that Day's impairments did not meet any of the Listings, including Listing 12.04 and 12.06. (Tr. 936)

- Dr. Caesar believed that Day had no restrictions of activities of daily living; he had moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no periods of decompensation. (Tr. 936)

- Dr. Caesar felt that Day had a personality disorder with antisocial features; he did not believe the record supported a diagnosis of bipolar disorder. (Tr. 937-938)

Vocational Expert ("VE") Mark Anderson also testified during the hearing. (Tr. 939-945)

- Day's past work included work as a lawyer, retail sales clerk and a faculty position. (Tr. 940-941)

- The ALJ asked the VE to consider a hypothetical individual who could do a range of work at all exertional levels – occasional "posturals," climbing of ramps and stairs, no ropes or ladders or scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling; and occasional exposure to hazards. The individual was limited to unskilled work – simple tasks; simple decision making; average production rate pace, but nothing that is fast and no strict quotas. He was limited to occasional interaction with supervisors but infrequent and superficial interaction with the public and coworkers. He needed to work in a nonconfrontational setting with no type of conflict resolution, mediation or negotiating – a static, low-stress environment with infrequent changes in work tasks. (Tr. 941)

- The VE opined that this individual could not perform Day's past work. (Tr. 941) However, this individual could perform the jobs of hand packager, industrial cleaner, and assembler of small products. There were a significant number of national jobs available for these positions. (Tr. 942)

- The VE's opinion was not altered with the addition of a limitation for frequent bilateral fine and gross manipulation with no bilateral overhead reaching in all directions. (Tr. 43) Nor was the VE's opinion altered when the hypothetical was modified to occasional bilateral fine and gross manipulation as well as occasional reaching bilaterally. (Tr. 44)

- When the ALJ added the limitation that the individual would need to take frequent, unscheduled breaks and would be tardy two or three times per month, the VE stated that all jobs would be precluded. (Tr. 942)

- The VE testified that his testimony was consistent with the DOT and supplemented by his experience and training as a vocational expert. (Tr. 942)

## IV.    Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[1]....

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations:

1. If the claimant is doing substantial gainful activity, she is not disabled.

2. If claimant is not doing substantial gainful activity, her impairment must be severe before she can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment,[13] claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents her from doing past relevant work. If claimant's impairment does not prevent her from doing his past relevant work, she is not disabled.

5. If claimant is unable to perform past relevant work, she is not disabled if, based on her vocational factors and residual functional capacity, she is capable of performing other work that exists in significant numbers in the national economy.

---

[1] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987). Under this

sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v.*

*Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner

at Step Five to produce evidence that establishes whether the claimant has the RFC and

vocational factors to perform work available in the national economy. *Id.*

## V.    ALJ's Findings and Decision

The ALJ's October 23, 2015 decision contained the following summarized findings:

1.  Day met the insured status requirements of the Social Security Act through
    June 30, 2014. (Tr. 886)

2.  Day had not engaged in substantial gainful activity from his alleged onset
    date, March 7, 2009, through the date last insured, June 30, 2014. (Tr. 886)

3.  Through the date last insured, Day had the following severe impairments:
    obesity and bipolar disorder with depression and anxiety (mood disorder). (Tr.
    887)

4.  Day did not have an impairment or combination of impairments that met or
    medically equaled the severity of one of the listed impairments. (Tr. 887)

5.  Through the date last insured, Day had the residual functional capacity ("RFC")
    to perform a full range of work at all exertional levels but he was precluded
    from working with ropes and scaffolds; he could occasionally kneel, crouch,
    and crawl; he could occasionally be exposed to industrial hazards. He was
    limited to simple tasks performed in a static work environment; he was
    precluded from fast-paced work and he could not perform work with quota
    requirements. He could occasionally interact with supervisors, but he was
    precluded from interacting with the public and co-workers. (Tr. 888-892)

6.  Day was unable to perform any past relevant work. (Tr. 893)

7.  He was born on May 20, 1962 and was 52 years old. However, on the date
    last insured he was considered a younger individual, age 18-49. (Tr. 893)

8.  Day had at least a high school education and was able to communicate in
    English. (Tr. 893)

9.  Transferability of job skills was not material to the determination of disability

because the claimant was "not disabled" whether or not he had transferable job skills. (Tr. 893)

10. Jobs existed in significant numbers in the national economy that Day could perform through the date last insured. (Tr. 893)

Based on these findings, the ALJ determined that Day was not under a disability from March 7, 2009, the alleged onset date, through June 30, 2014, the date last insured. (Tr. 894)

## VI.    Law & Analysis

### A.    Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also

support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

The court must also determine whether proper legal standards were applied. If not, reversal is required unless the error of law was harmless. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

## B. The ALJ's Treating Physician Analysis

Day argues that the ALJ did not comply with the treating physician rule because: 1) she

did not assign controlling weight to the opinions of Dr. Tran and Dr. Aneja; 2) she did not indicate the weight, if any, she assigned to their opinions; and 3) she failed to provide good reasons for rejecting their opinions.

Social Security Administration regulations dictate how medical opinions must be weighed. 20 C.F.R. § 404.1527(c). In general, the regulations require that an opinion from a medical source who has examined a claimant be given more weight than opinions from a source who has not performed an examination; and an opinion from a medical source who regularly treats the claimant is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship. *Id.* § 404.1502, 404.1527(c)(1)&(2). *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013). In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." *Id. citing* Social Security Rule No. 96–6p, 1996 WL 374180, at *2 (July 2, 1996).

If treating source opinions are (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with the other substantial evidence in [the] case record," then they must receive "controlling" weight. 20 C.F.R. §404.1527(d)(2); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 286 (6th Cir. 2009). If the treating source opinion is not given controlling weight, then the ALJ must apply several factors in determining the weight to give the opinion including: the length, frequency, nature, and extent of the treatment relationship; supportability; consistency; specialization; and other factors which support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2). These reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the

reasons for that weight." *Gayheart,* 710 F.3d at 376 (quoting SSR 96–2p, 1996 WL 374188 at \*5 (SSA)). These requirements are referred to as the treating physician rule.

"The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544–45 (6th Cir. 2004) (citing *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999)) (internal quotations omitted). Because the reason-giving requirement exists to "ensur[e] that each denied claimant receives fair process," the Sixth Circuit has held that an ALJ's "failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight" given "*denotes a lack of substantial evidence,* even where the conclusion of the ALJ may be justified based upon the record." *Id.* (quoting *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir.2007) (emphasis added)). However, although the regulations instruct an ALJ to consider various factors, they expressly require only that the ALJ's decision include "good reasons . . . for the weight . . . give[n][the] treating source's opinion"—not an exhaustive factor-by-factor analysis. *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1527(d)(2).

### 1.    Controlling Weight

Day contends that the ALJ failed to properly analyze whether the opinions of Dr. Tran and Dr. Aneja were entitled to controlling weight. ECF Doc. 10, Page ID# 1977. However, at page 7 of her opinion, the ALJ stated that she had considered these opinions under SSR 96-2p and found that they were not entitled to controlling weight because they were inconsistent with

the other substantial evidence of record.    (Tr. 890)  Treating source opinions must receive
"controlling weight" when they are:  (1) "well-supported by medically acceptable clinical and
laboratory diagnostic techniques" and (2) "not inconsistent with the other substantial evidence in
[the] case record."  20 C.F.R. §404.1527(d)(2).  Conversely, a Social Security Ruling explains
that "[i]t is an error to give an opinion controlling weight simply because it is the opinion of a
treating source if it is not well-supported by medically acceptable clinical and laboratory
diagnostic techniques or if it is inconsistent with other substantial evidence in the case record."
Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *5, 1996 WL 374188, at *2 (July 2, 1996). Thus, the
ALJ's finding that the treating source opinions were inconsistent with other substantial evidence
of record was a proper basis for declining to assign controlling weight to their opinions.  Day
disagrees with the ALJ's finding, as is further discussed below, but the ALJ did not fail to
properly analyze the first part of the treating physician rule.

## 2.    Weight Assigned to Opinions of Treating Psychiatrists

Day also argues that the ALJ was required to state the weight she assigned to the treating
sources and that reversal and remand are required when the ALJ rejects or discounts the weight
of a treating source without assigning weight. ECF Doc. 10, Page ID# 1977-1978.  Plaintiff cites
*Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 407-408 (6th Cir. 2009) in support of this
argument.  Day's invocation of *Blakely* fails to persuade.  In that case, the ALJ completely failed
to mention two of the treating sources and rejected one of the treating physician's opinions
because the ALJ felt that the opinion could have been the result of Blakely's insistence or his
physician's desire to assist Blakely in obtaining disability benefits.  Not so here.  The ALJ
considered Day's treating psychiatrist's opinions and seemed to assign great weight to portions
of their opinions.  For example, in Step 3 of the sequential evaluation, the ALJ explicitly relied

14

on "the claimant's own treating physician, Dr. Tran [who] at 20F rate[d] the claimant as having no more than moderate limitations . . . ." (Tr. 888)

Day faults the ALJ for not specifically stating the weight she assigned to the opinions of his treating physicians. However, the ALJ did explain the weight she assigned to their opinions. This explanation could not be reduced to a single word explanation such as "significant," "little," or "no," weight because the ALJ found that some of the opinions expressed in the treating physicians' statements were consistent with the other medical records and some were not. She explained which portions of the opinions she relied upon and which portions she rejected. In this, the ALJ did not err.

### 3. Good Reasons Explained

#### a. GAF Scores

Day next argues that the ALJ failed to provide good reasons for rejecting the opinions of his treating physicians. ECF Doc. 10, Page ID# 1978. First, Day contends that the ALJ was wrong to reject the opinions of his treating sources based on the GAF scores they and other physicians assigned. ECF Doc. 10, Page ID# 1979. As discussed above, this argument actually proves that the ALJ did not completely reject the opinions expressed by the treating physicians. For example, the ALJ found Dr. Aneja's functional capacity opinion to be inconsistent with her GAF score:

> The report dated July 2011 rates the claimant as 60 to 80% functioning but the written portion of the form states the claimant would have difficulty in work tasks. Again, the GAF is 60-65 which would denote no more than mild to moderate limits.

(Tr. 890) Day counters this with his argument that GAF scores may have little bearing on an individual's social and occupational functioning; that they are transient in nature; and that they do not necessarily provide an accurate depiction of the claimant's typical ability to function.

Day also argues that the Social Security Administration limits the use of GAF scores in determining disability for this very reason. ECF Doc. 10, Page ID# 1979.

But Day hasn't cited any cases holding that an ALJ is not permitted to consider the GAF scores in the medical record. Nor is the undersigned aware of any such authority. In fact, the Sixth Circuit has held that it takes a case-by case approach to the value of GAF scores. *Miller v. Comm'r of Soc. Sec.,* 811 F.3d 825, 836 (6th Cir. 2016). Depending on the record and the facts of each case, the GAF scores may be significant or of little evidentiary value. See *Kornecky v. Comm'r of Soc. Sec.,* 167 Fed. Appx. 496, 511 (6th Cir. 2006); *Keeton v. Comm'r of Soc. Sec.,* 583 Fed. App'x. 515, 529-530 (6th Cir. 2014); *Gribbins v. Comm'r of Soc. Sec. Admin.,* 37 F. App'x 777, 779 (6th Cir. 2002).

Day has a lengthy medical history containing numerous records assigning GAF scores. There are several consistent scores of 60-65 in the record. (Tr. 807, 1804, 1872) This is not a case where the GAF scores are inconsistent over time or merely differ because they were assigned by different medical providers. In fact, plaintiff has not pointed to any lower GAF scores in the record. Rather, he simply argues that it was improper for the ALJ to consider this evidence because the evidence is inherently unreliable. Contrary to Day's position, it was not improper for the ALJ to consider the GAF scores assigned by Day's own treating sources. Simply put, the ALJ did not err in noting either the consistency of Day's GAF scores or the fact that these scores suggested only mild to moderate symptoms. And the ALJ was permitted to rely upon the GAF scores as a basis for discounting the treating source opinions.

**b.      Dr. Tran's Opinion**

Next, Day argues that the ALJ failed to provide good reasons for rejecting Dr. Tran's

opinion that Day would miss more than four days of work per month because of his mental

impairments.  Regarding Dr. Tran's various medical statements, the ALJ stated:

> At Exhibits 9F and 17F, there are reports from Dr. Michael Tran.  ***
>
> For example, Dr. Tran based his opinion upon the claimant's "self-reports" of
> symptomatology. (Ex. 20F)  Dr. Tran's reports are also internally inconsistent.
> While he opines that the claimant would miss 4 days a month of work, he
> ultimately concludes the claimant has only moderate difficulties in the mental
> domains.  There are no marked or extreme limitations.  The corresponding
> treatment notes simply do not support his ratings.

(Tr. 89) Day contends that the ALJ failed to focus on the functional implications from the

definition of "moderate" on the check-box form completed by Dr. Tran.  The form defined

moderate as "an impairment that reduces the ability to function 17-32% in an eight (8) hour day.

Day argues that this moderate rating was not inconsistent with Dr. Tran's opinion that Day

would miss four days of work per month.  Day also argues that Dr. Tran's opinion was consistent

with his history of losing jobs because of attendance problems.

The undersigned does not agree with Day that the definition of moderate on the check

box form necessarily corresponds with Dr. Tran's opinion that Day's impairments would cause

him to miss work four days per month.  The "moderate" rating is defined in terms of how an

individual's ability to function is impacted within an eight hour work day.  As pointed out by the

ALJ, Dr. Tran could have checked boxes to indicate that Day's impairments were "marked" or

"extreme."  (Tr. 851-852)  But Dr. Tran indicated that plaintiff's impairments were moderate in

every category.  By definition, then, Tran felt that none of Day's conditions were marked or

extreme.  It was not error for the ALJ to find that Dr. Tran's moderate ratings were inconsistent

with the number of workday absences he predicted.  Moreover, the handwritten section of Dr.

Tran's statement twice referred to Day's "reports," suggesting that his opinions were, in part, a recitation of Day's self-reported symptoms. (Tr. 854)

Day contends that his history of losing jobs because of attendance problems was consistent with Dr. Tran's opinion that he would miss four days a month. ECF Doc. 10, Page ID# 1980. However, this work history was largely based on Day's own reports. Moreover, the fact that Day had held so many different jobs could also be construed as evidence that he was capable of obtaining employment. Day even testified that he had held one job for six or seven years despite being chronically late. (Tr. 1884)

The substantial evidence standard presupposes a "zone of choice," within which the ALJ may decide without interference from the courts. *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 833 (6th Cir. 2006). Even if a reviewing court would resolve the factual issues differently, when supported by substantial evidence, the Commissioner's decision must stand. *See Foster v. Halter,* 279 F.3d 348, 353 (6th Cir. 2001). The Commissioner's rejection of Dr. Tran's opinion that Day would be absent four days a month is supported by substantial evidence in the record. The ALJ did not improperly reject this part of Dr. Tran's opinion.

### c.      Dr. Aneja's Opinion

Day also argues that the ALJ decision failed to evaluate Dr. Aneja's opinion and simply focused on a few of her office notes. Plaintiff interprets Dr. Aneja's opinion as indicating that Day would be unable to relate appropriately with coworkers 30% of the time and unable to interact with his supervisor 40% of the time.

Contrary to Day's opinion, the ALJ did not completely ignore Dr. Aneja's opinion. Page 7 of her decision stated:

> * * * Exhibit 17F is a report from Dr. Jyoti Aneja. The report dated July 2011
> rates the claimant as 60-80% functioning but the written portion on the form

states the claimant would have difficulty in work tasks. Again, the GAF is 60-65 which would denote no more than mild to moderate limits.

The ALJ stated that the opinion was not entitled to controlling weight because it was inconsistent with other substantial evidence of record. The ALJ then listed several of Dr. Aneja's records which the ALJ concluded were inconsistent with some of her opinions. For example, the ALJ stated:

> At 19F, Dr. Aneja noted the claimant was working and that he "still enjoys what he does but concerns about weight gain. [Her] note indicated an adjustment in medications with no issues regarding SI/MI; mood anxious, full affect, cpp sustained and no serious issues noted.

(Tr. 888)

Day argues that the ALJ should have assigned controlling weight to Dr. Aneja's opinion and particularly her opinion that he would miss more than four days of work per month. However, the ALJ's decision to assign less than controlling weight to Dr. Aneja's statement was supported by substantial evidence. The form that Dr. Aneja completed was, for the most part a check box form.[2] Dr. Aneja was asked to place an x on a scale showing the percentage of the

---

[2] A check-box opinion, unaccompanied by any explanation, is "'weak evidence at best' and meets our patently deficient standard." *Hernandez v. Comm'r of Soc. Sec.*, 644 Fed. App'x 468, 475 (6th Cir. 2016) (citing *Friend v. Comm'r of Soc. Sec.*, 375 Fed. App'x 543, 551 (6th Cir. 2010)). See, e.g., *Kepke v. Comm'r of Soc. Sec.*, 636 Fed. App'x 625, 2016 WL 124140 at *4 (6th Cir. 2016) ("Dr. Chapman's checklist opinion did not provide an explanation for his findings; therefore, the ALJ properly discounted it on these grounds."); accord *Langlois v. Colvin*, No. 3:15-CV-01682, 2016 U.S. Dist. LEXIS 58681, 2016 WL 1752853 at *8 (N.D. Ohio May 3, 2016) (Vecchiarelli, M.J.) (finding the ALJ did not err by rejecting a treating source's unexplained checklist opinion); see also *Hyson v. Comm'r of Soc. Sec.*, No. 5:12CV1831, 2013 U.S. Dist. LEXIS 79803, 2013 WL 2456378, at *14 (N.D. Ohio June 5, 2013) (Burke, M.J.) (finding that because Dr. Martinez merely checked the boxes on the form while leaving those sections of the form blank where she was to provide her written explanation, she failed to provide any substantive basis for her conclusions and the ALJ was not required to accept her opinions); *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) ("We have held that the ALJ may 'permissibly reject[] ... check-off reports that [do] not contain any explanation of the bases of their conclusions.'") (citations omitted); *Smith v. Astrue*, 359 Fed. App'x 313, 316 (3d Cir. 2009) ("checklist forms ... which require only that the completing physician 'check a box or fill in a blank,' rather than provide a substantive basis for the conclusions stated, are considered 'weak evidence at best' in the context of a disability analysis.") (citations omitted); cf. *Price v. Comm'r SSA*, 342 Fed. App'x 172, 176 (6th Cir. 2009) ("Because Dr.

day that she felt Day could satisfactorily perform a job.  Dr. Aneja provided very little explanation as to the percentages she assigned to Day.  However, as observed by the ALJ, Dr. Aneja appears to have opined that Day could perform satisfactorily in most areas 60-80% of the time. (Tr. 804-807)  Dr. Aneja did not provide any explanation for her opinion that Day would miss work more than four times a month.  Even the handwritten sections of Dr. Aneja's statement seem to convey only mild impairments.  For example, Dr. Aneja stated that "Mr. Day has fairly high intellectual ability with no acute symptoms of any thought process disorganization or issues with comprehension.  At times, shows some memory related issues and needs constant and periodic mental health assessments to prevent decompensation."  (Tr. 805)

As noted above, there is a "zone of choice," within which the ALJ may decide without interference from the courts.  *McClanahan,* 474 F.3d at 833.  Here, the ALJ evaluated Dr. Aneja's medical source statement and provided good reasons for refusing to assign controlling weight to it.  The ALJ noted that Dr. Aneja's statement reflected mostly mild impairments and that Day could function satisfactorily 60-80% of the time.  She felt that Dr. Aneja's opinions were inconsistent and were not supported by her treatment notes.  The ALJ cited specific treatment notes in which Dr. Aneja noted that Day still enjoyed working. (Tr. 891)  The ALJ adequately supported her decision to reject Dr. Aneja's opinion that Day would be absent four days a month with substantial evidence in the record.

### C.     The ALJ's Evaluation of Other Source Opinions

Day also argues that the ALJ failed to properly evaluate the opinions of his treating therapists according to SSR 06-3p.  Day contends that the ALJ neither addressed the opinion of

---

Ashbaugh failed to identify objective medical findings to support his opinion regarding [claimant's] impairments, the ALJ did not err in discounting his opinion.")

Therapist Liviskie nor properly evaluated the opinion of Certified Advanced Nurse Fuller. ECF Doc. 10, Page ID# 1983.

In the Sixth Circuit, "an ALJ has discretion to determine the proper weight to accord opinions from 'other sources.'" *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007). While the ALJ "does not have a heightened duty of articulation when addressing opinions issued by 'other sources,' the ALJ must nevertheless "consider" those opinions." *Hatley v. Comm'r of Soc. Sec.*, 2014 U.S. Dist. LEXIS 99471, 2014 WL 3670078 (N.D. Ohio); see also *Brewer v. Astrue,* 2012 U.S. Dist. LEXIS 10643, 2012 WL 262632, at *10 (N.D. Ohio 2012) ("SSR 06-03p, 2006 SSR LEXIS 5 does not include an express requirement for a certain level of analysis that must be included in the decision of the ALJ regarding the weight or credibility of opinion evidence from 'other sources.'").

The ALJ listed the reports of Kristen Liviskie and Nurse Fuller among the opinions she considered. (Tr. 890) The ALJ stated that she did not assign them controlling weight because they were inconsistent with other substantial evidence of record. (Tr. 890) Later in her decision, the ALJ quoted a portion of Ms. Liviskie's treatment notes in her analysis of Day's credibility. One of her notes states that Day was making significant progress until he was denied for disability. (Tr. 891, 1254) If Ms. Liviskie and Nurse Fuller were treating physicians, the ALJ's analysis of their opinions would be inadequate. However, as noted above, the ALJ was not required to articulate a certain level of analysis in her decision for the opinions of these other sources. The ALJ indicated that she considered their opinions, which is all that was required of her by the regulations. Contrary to plaintiff's argument, the ALJ did not totally disregard the opinions of Ms. Liviskie and Nurse Fuller and the case should not be remanded on that basis.

The ALJ adequately analyzed the opinions of Day's treating sources and his other medical sources. And the weight she assigned to those opinions was supported by substantial evidence in the records. Remand on the handling of medical source opinions is not warranted.

### D. The ALJ's RFC Determination

#### 1. Sustainability

Day argues that the RFC determination does not include any limitations reflecting his inability to sustain work. Day argues that his work history of failing to show up and/or showing up late documented his inability to adhere to a schedule. He argues that his treating psychiatrists and Ms. Liviskie were aware of this issue. Day challenges the ALJ's credibility assessment and her finding that he was noncompliant with recommended treatment plans. ECF Doc. 10, Page ID# 1986. (Tr. 892) Day also argues that the ALJ ignored his obsessive compulsive disorder. Day cites a psychotherapy plan signed by Richard Johnson in 2012 in support of this obsessive compulsive diagnosis. (Tr. 1444)

Before an ALJ moves from Step Three to Step Four, the claimant's RFC is determined. §§ 404.1520(a)(4), 416.920(a)(4). *Kado v. Colvin,* No. 1:15-cv-02044, 2016 U.S. Dist. LEXIS 143321 (N.D. Ohio, Sept. 7, 2016). The RFC "is the most you can still do despite your limitations." 20 C.F.R. §§ 404.1545, 416.945. The final responsibility for deciding the RFC is reserved to the Commissioner. 20 C.F.R. § 416.927(d)(2). "As such, the ALJ bears the responsibility for assessing a claimant's RFC, based on all of the relevant evidence." *Kline v. Astrue,* No. 1:12-CV-01802, 2013 U.S. Dist. LEXIS 66287, 2013 WL 1947164, at *3 (N.D. Ohio Apr. 17, 2013), report and recommendation adopted sub nom. *Kline v. Colvin,* No. 1:12 CV 1802, 2013 U.S. Dist. LEXIS 66285, 2013 WL 1946201 (N.D. Ohio May 9, 2013) (citing 20 C.F.R. § 416.946(c)). "In rendering his RFC decision, the ALJ must give some indication of the

evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011) (citations omitted). While the RFC is for the ALJ to determine, it is well established that the claimant bears the burden of establishing the impairments that are considered in assessing the RFC. See *Rabbers v. Comm'r Soc. Sec. Admin.,* 582 F.3d 647, 652 (6th Cir. 2009). ("The claimant bears the burden of proof through step four; at step five, the burden shifts to the Commissioner."); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 391 (6th Cir. 1999).

Contrary to Day's arguments, the ALJ included limitations in his hypothetical questions and RFC related to Day's ability to sustain employment. The ALJ stated,

> The claimant's symptoms have waxed and waned based on the extensive treatment notes. He has held high level positions as a licensed attorney and instructor; however, he has struggled to keep those positions based on several factors from deadlines to behavior. The medical expert testified that a personality disorder would cause the types of interpersonal conflicts described and that the claimant would benefit from an environment that had more flexible deadlines and less restrictive supervision. Based on the medical expert's testimony, I have reduced the claimant to unskilled work.

(Tr. 890) The ALJ also included the following RFC limitations related to Day's mental impairments:

> The claimant is limited to simple tasks performed in a static work environment. He is precluded from fast-paced work and he cannot perform work with quota requirements. He can occasionally interact with supervisors. He is precluded from interaction with the public and with co-workers.

(Tr. 889) As it relates to Day's ability to sustain employment, the ALJ's RFC finding was supported by substantial evidence. Dr. Caesar reviewed Day's medical records through 2011 and observed Day at the administrative hearing before expressing his opinion. Dr. Caesar's

testimony and other evidence in the record supported the ALJ's RFC finding relating to Day's ability to sustain employment. *See Barker v. Shalala,* 40 F.3d 789, 794 (6th Cir. 1994).

Plaintiff argues that the RFC was contrary to his work history. The ALJ considered Day's work history – only one part of the record – and found that although he could not perform his past work, he would be able to perform more simple work with certain restrictions. (Tr. 890) The ALJ was not required to weigh this evidence differently than she did. Plaintiff cites no authority to the contrary.

## 2.    Credibility/Noncompliance

Next, Day contends that the ALJ improperly determined that his noncompliance with treatment recommendations affected his credibility concerning the work he was capable of sustaining. Day argues that the ALJ was required to consider whether his mental impairments affected his ability to comply with prescribed treatment and whether following the prescribed treatment would have restored his ability to work. Day cites 20 C.F.R. 416.930 in support of his argument that the ALJ was required to consider certain factors before finding that Day was noncompliant. Day's argument is misplaced. 20 C.F.R. 416.930 provides, in part:

> (a) What treatment you must follow. In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work.
>
> (b) When you do not follow prescribed treatment. If you do not follow the prescribed treatment without a good reason, we will not find you disabled or blind or, if you are already receiving benefits, we will stop paying you benefits.

This section precludes benefits to individuals who are determined to be disabled but are not complying with treatment *if* the Commissioner determines that the treatment would be expected to restore the ability to work. Here, the ALJ determined that Day was not otherwise disabled.

Thus, there was no need to conduct the analysis described in 20 C.F.R. 416.930. *See Carr v. Colvin,* 2013 U.S. Dist. LEXIS 46912 at *69-*70 (M.D. Tenn., 2013).

The ALJ considered Day's noncompliance with treatment only in relation to his credibility. The ALJ determined that Day's disability allegations were not fully credible. She quoted several medical records showing that Day was non-compliant with treatment and that there was a possibility of malingering. (Tr. 892) Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. See *Siterlet v. Sec'y of Health & Human Servs.,* 823 F.2d 918, 920 (6th Cir. 1987). It was not improper for the ALJ to consider Day's noncompliance with treatment in assessing his credibility.

Next, Day contends that the ALJ improperly ignored a treatment note in the record indicating that he has obsessive compulsive disorder. ECF Doc. 10, Page ID# 1986-1987. This record is contained in a psychotherapy treatment plan signed by Richard Johnson. Day does not argue that Johnson was a treating physician or even that this record constituted an opinion from a medical source. Dr. Tran did list obsessive compulsive disorder in a "problem list" in his treatment notes for January 29, 2010 and indicated that it was first noted on 12/18/09. But that same record lists only "Depressive Disorder, not Elsewhere Classified" as the "encounter diagnosis." (Tr. 478-479) Thus, it is not clear that OCD was even a current diagnosis. No physician opined that the condition had caused Day to experience any functional limitations. And Day has not pointed to any other evidence that he was functionally limited due to this condition. There is no requirement, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Van Der Maas v. Comm'r of Soc. Sec.,* 198 F. App'x 521, 526 (6th Cir. 2006); *Kornecky v. Comm'r of Soc. Sec.,* 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his written

decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.,* 200 F.3d 436, 453 (6th Cir. 1999))).  Here, the ALJ did not err in failing to explicitly discuss Day's diagnosis of obsessive compulsive disorder when explaining her RFC determination.  There is no evidence that this condition limited Day's abilities to work in a way that would have affected the RFC determination.

### 3.    Hypothetical Question to VE

Finally, Day argues that the ALJ's hypothetical question to the VE did not accurately describe Day and could not serve as substantial evidence to support the conclusion that there were many jobs Day could do despite his limitations.  Day points out that the RFC determination *precluded* Day from interaction with the public and co-workers.  However, the ALJ's question to the VE indicated that Day could have *infrequent and superficial interaction* with the public and with co-workers.  Day points out that this this difference is significant.  The VE was not asked what jobs were available for an individual who could have no contact with coworkers or the public.  Day argues that the VE would likely have opined that there would not be any employment for such an individual.  Day also contends that the VE's testimony cannot serve as substantial evidence for the ALJ's Step Five conclusion.

The Commissioner has seemingly asserted a harmless error argument in response to this point.  The Commissioner does not contend that the ALJ's RFC determination matched her question to the VE.  Rather, the Commissioner argues that the jobs identified by the VE in response to the question do not require talking.  ECF Doc. 11, Page ID# 2040.  In other words, the Commissioner argues that these jobs could have been performed by an individual who was precluded from any contact with coworkers or the public.

"In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments." *Ealy v. Comm'r of Soc. Sec.,* 594 F.3d 504, 516 (6th Cir. 2010). Here, it appears that the ALJ either erred in her question to the VE or erred in stating her RFC finding in her decision. Perhaps this was a mere misstatement in the RFC or in the hypothetical question that could be explained easily. Unfortunately, this court is not at liberty to supply such an explanation. To rely on the VE's testimony as substantial evidence supporting the RFC, the ALJ's question to the VE was required to match her RFC determination. Because it didn't match and because the RFC finding was more restrictive than the question to the VE, the ALJ erred in relying on the VE's answers to support her conclusion that there were jobs that someone with Day's limitations could do.

The Commissioner's argument that the positions identified by the VE did not require talking is not well taken. The RFC determination did not say "no talking," it specified "no interaction." People interact in many ways other than through their speech. In order for the VE's testimony to serve as substantial evidence for the RFC determination, the ALJ should have been asked about an individual who was precluded from interaction with coworkers and the public. If the ALJ had asked the VE about an individual who could have *no* interaction with coworkers or the public, the VE's response may well have been different. Given the record, it is impossible to say that this error was harmless. I recommend that this matter be remanded for clarification of this part of the ALJ's RFC finding or of her Step Five conclusion.

### E.      Remand

Day cites *Gentry v. Comm'r of Soc. Sec.,* 741 F.3d 708, 730 (6th Cir. 2014) for the proposition that

> [b]enefits may be awarded immediately if all necessary factual issues have been resolved, "the proof of disability is strong, and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming.

This is not a case where the proof of disability is so strong and opposing evidence is lacking. Rather, this case involves a discrete error in a single portion of the ALJ's RFC finding. I am recommending that this case be remanded so that the Commissioner can clarify the RFC finding. It is unclear whether the ALJ's finding that Day was precluded from interaction with coworkers and the public was a simple misstatement or whether another hearing would be required to further inquire of a VE regarding this finding. Either way, the proof of disability in this case is not overwhelming. I do not recommend that this matter be reversed without remanding.

## VII. Recommendation

The court should find the Commissioner's Step Five conclusion was not supported by substantial evidence. However, the Commissioner's handling of the medical evidence of record was supported by substantial evidence and requires no remand. I recommend that the final decision of the Commissioner be VACATED and that the case be REMANDED, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Report and Recommendation.

Dated: December 5, 2017

Thomas M. Parker
United States Magistrate Judge

---

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *U.S. v. Walters,* 638 F.2d 947 (6th Cir. 1981). See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).